## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MAGNUS, INC.,                     ) | |
|                      ) | |
|       **Plaintiff,**        ) | |
|                      ) | **CIVIL ACTION** |
| **v.**                        ) | |
|                      ) | **No. 10-1422-KHV** |
| **DIAMOND STATE INSURANCE**  ) | |
| **COMPANY,**             ) | |
|                      ) | |
|       **Defendant.**     ) | |

## MEMORANDUM AND ORDER

Magnus, Inc. brings suit against Diamond State Insurance Company to recover under insurance policies which Diamond issued to Precision Designed Products ("PDP"). Specifically, Magnus asserts that Diamond breached its agreement to insure and defend PDP with regard to claims which Magnus brought against PDP in Montgomery County, Kansas, Case No. 2008CV119I.[1] See Pretrial Order (Doc. #49) filed August 25, 2014 at 13-14, ¶ 4. Magnus also asserts that Diamond unjustifiably refused to pay the insurance claim. Id. at 14, ¶ 5. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #17) filed July 11, 2011, plaintiff's Motion For Reconsideration Of Denial Of Oral Arguments On Summary Judgment (Doc. #43) filed May 5, 2014 and the Motion Of Plaintiff, Magnus, Inc., For Partial Summary Judgment On The Question Of Insurance Company Liability For Payment Of The State Court Judgment ("Magnus Motion For Partial Summary Judgment") (Doc. #51) filed October 3, 2014. On March 24, 2015, the Court held a telephone conference with the attorneys

---

[1] The state court action was subsequently transferred to Ellis County. To settle the state case, PDP consented to judgment in the amount of $284,519.75 and assigned Magnus its rights to recover under the Diamond insurance policies.

in the case.  For reasons stated at the conference and below, the Court overrules Diamond's motion for summary judgment, overrules Magnus's motion for oral argument and sustains in part Magnus's motion for partial summary judgment.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  Id. at 251-52.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those "dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  And, while the Court views the record in a light most favorable to the party opposing summary judgment, the nonmoving party may not rest on its pleadings but must set forth specific facts.  Id.  The nonmoving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789,

794 (10th Cir. 1988).  If the nonmoving party's evidence is merely colorable or is not

significantly probative, summary judgment may be granted.  Liberty Lobby, 477 U.S. at 250-51.

### Facts[2]

The following facts are undisputed.

Mike Sohm is chief executive officer of Magnus, which sells archery products.

Keith Jabben owns and operates PDP, which manufactures arrow components for the

archery industry.  For each year from September 21, 2001 through September 21, 2005,

Diamond State Insurance Company issued PDP a commercial general liability ("CGL")

insurance policy.  The policies contain substantially the same language and provide the same

coverage.[3]

In August of 2002, Magnus and PDP entered into an agreement under which Magnus

agreed to purchase certain aluminum broadhead adapters from PDP.[4]  The record is rife with

---

[2]        The Court includes only those facts which are relevant to its rulings herein.  Also, pursuant to D. Kan. Rule 56.1, the Court considers only those facts which the parties include in their statement of facts, in numbered fact paragraphs with proper record citation and support. See Vasquez v. Ybarra, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001).  Pursuant to D. Kan. Rule 56.1, for purposes of summary judgment, the Court deems all such facts admitted unless specifically controverted by the opposing party.  See id.  The Court does not consider facts which the parties discuss only in the argument section of their briefs and not in a statement of facts pursuant to D. Kan. Rule 56. 1, see Jones v. Unified Gov't Of Wyandotte County/Kansas City, Kan., 552 F. Supp.2d 1258, 1261 n.  (D. Kan. 2008), and the Court does not consider facts which the record citation does not properly support.  Finally, the Court declines to consider arguments raised for the first time in a reply brief.  See Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000); Rubio v. Turner Unified Sch. Dist. No. 202, 523 F.Supp.2d 1242, 1252 (D. Kan. 2007).

[3]        For purposes of this ruling, the Court uses the CGL policy which Diamond issued PDP for the policy period September 21, 2001 through September 21, 2002 ("CGL Policy"), i.e. Exhibit G to Defendant's Memorandum In Support Of Its Motion For Summary Judgment ("Diamond Memorandum") (Doc. #18) filed July 11, 2011.

[4]        A broadhead is a flat-pointed steel arrowhead having sharp edges.  See Webster's Third New International Dictionary (1986) at 280.

genuine issues of material fact whether the agreement required PDP to use a specific grade of aluminum. Magnus contends that PDP agreed to provide adapters made with 7075–T6 aluminum or 6061 aluminum if 7075–T6 aluminum was not readily available. PDP contends that it agreed to initially supply broadheads out of 2011 grade and to look into using 7075 grade in the future, but that it never agreed to supply adapters out of anything other than 2011 grade aluminum. Grade 7075-T6 aluminum is harder than 6061 grade aluminum, and 6061 grade aluminum is harder than 2011 grade aluminum. Whatever the parties' agreement, PDP supplied adapters of 2011 aluminum.[5]

The adapters which PDP supplied to Magnus were permanently glued to broadheads, so that arrow users could screw the broadheads on and off the leading or point ends of arrow shafts.[6] A typical arrow user may attach different broadheads with different types of arrow blades − depending on the type of game which he or she is hunting − and/or replace the broadhead with a target point for target practice. Typically, an arrow user can use a common broadhead wrench to remove a broadhead from an arrow. The ability to interchange broadheads is an important functional characteristic of an arrow. In addition, some blades are razor sharp and must be stored separately from the arrow shaft to prevent cutting and stabbing injuries.

On August 30, 2002, PDP issued Magnus its first invoice for the broadhead adapters.[7]

---

[5]     PDP subcontracted with Automatic Screw Machine Services ("ASMS") to manufacture the adapters, but that fact is not material to the rulings herein.

[6]     Although the record is not clear, it appears that Magnus integrated PDP adapters into broadheads which it sold to consumers. In any event, the adapters ended up on broadheads attached to arrows which Magnus customers owned.

[7]     The record does not disclose the date of the first shipment, the number of adapters shipped or the invoice amount. On September 30, 2002, Magnus informed PDP that it was sending back "the 1000 pieces." Memorandum from Sohm to Jabben dated September 30, 2002, Exhibit U to Diamond Supplemental Brief (Doc. #50).

A month later, on September 30, 2002, Magnus informed PDP that it was experiencing problems with the adapters "seizing," i.e. becoming permanently affixed to arrows.[8]  Magnus stated that it was returning 1,000 pieces and suggested ways in which PDP could improve the design of the adapters.  Id.  The record does not disclose whether PDP incorporated the new design and if so, whether it resolved the initial seizing issues.[9]  Also, the record does not reflect

_____

[8]     Specifically, Sohm sent Jabben a memorandum which stated as follows:

We tried about everything we know and the adapters are still seizing up, now I realize in reality this is going to happen occasionally, which is fine, but when you try 10 and 3 to 4 seize, it could cause us major problems.

I want to do this with you and I have done a lot of research on this, first of all I like the idea of having your grooves deeper to reduce the weight and I know your quality will be 100 times better than Satellite.

I have enclosed a print of a shoulder, [as] you can see on this particular shoulder, this is how we had our new stinger ferrules done and we have not had one seize. [As] you can see it as at .200 (which I also talked to every broadhead manuf and the reason they like it this size is for exactly the seizing problem).

[As] you can see there is a good starting point on the end, which allows the part to get started and a good chamber at the end of the shoulder.

Could you possibly put this shoulder in on the ones you make for us????  Or something similar.

Please let me know.  I am sending back the 1000 pcs, maybe you can come up with something to make them work or sell them [as] 5/16th adapters.  I am just not comfortable putting them in our heads when they are seizing.  * * *

Memorandum from Sohm to Jabben dated September 30, 2002, Exhibit U to Diamond Supplemental Brief (Doc. #50) (emphasis omitted).

[9]     In an affidavit prepared for the state court case, Sohm stated that Magnus rejected several early shipments of adapters because they contained aluminum shavings which caused or contributed to excessive seizing.  See Affidavit Of Mike Sohm ¶ 9, Exhibit P to Diamond Memorandum (Doc. #18).  Sohm stated that PDP replaced those adapters with new adapters free of shavings.  Id.

whether Magnus and PDP discussed the type of aluminum which PDP used for the adapters at that time.

About a year and a half later, on March 15, 2004, Magnus informed PDP that it had had a lot of problems with broadheads seizing onto customers' arrows, that customers were very upset and that under no circumstances should PDP make Magnus adapters with 2011 grade aluminum.[10]  See Memorandum from Sohm to Jabben dated March 15, 2004, Exhibit V to Diamond Supplemental Brief (Doc. #50).

Over a year later, on June 9, 2005, PDP issued Magnus its last invoice.[11]

Magnus asserts that PDP provided adapters with a softer grade of aluminum than the intended application and the purchase order required; that the adapters "seized" or became permanently affixed to arrows; and that as a result, Magnus customers could not remove their broadheads or perform screw-off functions on blades or arrow tips.  As a result, the arrows became worthless or had very little value and Magnus customers became unhappy with having their arrows ruined.  Magnus attempted to remedy the situation by sending new broadheads at no

---

[10]    Specifically, Sohm sent Jabben a memorandum which stated as follows:

I received your email where you mentioned 2011 multiple times, I realize you make the arrow inserts out of this very soft material, however, 2011 is not acceptable in our Magnus adapters.

We have had a lot of problems with seizing of our broadheads into customers arrows and very upset customers.

Under no circumstances should 2011 or 2000 series material be used on Magnus adapters.

Memorandum from Sohm to Jabben dated March 15, 2004, Exhibit V to Diamond Supplemental Brief (Doc. #50).

[11]    The record does not disclose the date of the last shipment, the number of adapters shipped or the invoice amount.

charge, but it did not recall the products.  Due to unhappy customers, Magnus suffered lost business profits and earnings.

On February 4, 2008, Magnus filed suit against PDP in Montgomery County, Kansas. Magnus alleged that PDP failed to supply adapters according to Magnus specifications, and asserted claims for breach of implied warranty of fitness, breach of implied warranty of merchantability and breach of express warranty.  Magnus asserted that because PDP did not provide adapters made with 7075 or 6061 grade aluminum, it suffered decreased sales and damage to its business reputation.

In the course of the state court litigation, Magnus retained a financial expert witness, Steven D. Regier, C.P.A.  In a report dated April 27, 2009, Regier opined that beginning in 2004, Magnus experienced dramatically reduced sales of products using broadhead adapters.  See Regier Report at 2, Exhibit R to Diamond Memorandum (Doc. #18).  Regier estimated that as a result of the allegedly defective PDP adapters, Magnus lost a total of $284,519.75 in past and future earnings.  See id. at 4.  Specifically, Regier opined that from 2004 through December 14, 2009 (the state court trial date), Magnus lost earnings of $156,314.61.  See id. at 3.  Regier projected future lost earnings of $128,205.14.  See id. at 3-4.

On August 9, 2009 – 18 months after Magnus filed suit – PDP notified Diamond and requested it provide a defense.  Four days later, on August 13, 2009, Diamond provided written notice that it was denying the request based on various grounds.  Specifically, Diamond quoted provisions of the CGL policy and stated as follows:

> As you can see from the policy language, forms, conditions, definitions and exclusions [t]here is no coverage for property damage to your work/your product, nor for a defect, deficiency, inadequacy or dangerous condition in [y]our work/work product, or for a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms, nor for any loss, cost or expense incurred by you or others for the loss of use, recall

7

repair, replacement, adjustment, removal or disposal of your work/work product. There is no coverage for you/your company for any intentional acts or for any contractual liability.  There is no coverage for property damage arising out of the use, or sale of firearms or other weapons.  There would be a question of coverage due to late notice as well. . . . Diamond State Insurance Company does not waive any of its rights under the policy and specifically reserves its right to alter or amend its coverage position should its receipt of further information warrant such a determination.

Ex. D to Diamond Memorandum (Doc. #18).

On June 15, 2010, PDP and Magnus agreed to settle the state lawsuit. Specifically, Magnus agreed to dismiss its claims in exchange for a consent judgment in the amount of $284,519.75, i.e. to a penny, the amount which Regier estimated that Magnus had lost in past and future earnings.  Under the settlement, PDP assigned Magnus its rights to recover under CGL policies issued by Diamond.

On June 22, 2010, PDP confessed judgment in favor of Magnus in the amount of $284,519.75.[12]

---

[12]      Diamond asserts that in the underlying case, Magnus sought to recover costs and expenses in responding to customer complaints.  See Diamond Memorandum (Doc. #18) at 13, ¶ 19.  Diamond's record citation does not support that assertion.  See Magnus Responses to PDP Interrogatories ¶ 19, Exhibit S to Diamond Memorandum (Doc. #18) (alleging damages of lost sales and damage to reputation).

Diamond also asserts that Magnus sought damages incurred as a result of having to repair, replace and eventually withdraw PDP adapters.  See Diamond Memorandum (Doc. #18) at 14, ¶ 20.  Again, Diamond's record citation does not support the assertion.  See Regier Report at 1 (reciting fact that Magnus resolved customer complaints by replacing defective parts; not discussing damages incurred as a result of repairing, replacing or withdrawing adapters).

Based on the undisputed facts, the Court finds that the consent judgment represents damages for past and future lost earnings suffered by Magnus.  See Journal Entry of Judgment ¶ 2, Exhibit F to Diamond Memorandum (Doc. #18) (citing Regier Report regarding amount of damages Magnus suffered).

Under the CGL policies, Diamond agreed to pay "those sums that the insured becomes legally obligated to pay as damage because of 'bodily injury' or 'property damage' to which this insurance applies."  CGL Policy § I, ¶ 1(a).  "Property damage" is defined as follows:

(a)     Physical injury to tangible property, including all resulting loss of use of that property. . . . . or

(b)     Loss of use of tangible property that is not physically injured. * * *

Id. § V, ¶ 15.

The insurance applies to property damage only if it is caused by an "occurrence" that takes place in the coverage territory and occurs during the policy period.  Id. § I, ¶ 1(b)(1) and (2).  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  Id. § V, ¶ 12.

## Prior Proceedings

On March 6, 2012, the Court entered an order which sustained Defendant's Motion For Summary Judgment (Doc. #17) on the issue of coverage.  See Memorandum And Order (Doc. 24).  Specifically, under Maryland Cas. Co. v. Mike Miller Cos., Inc., 715 F. Supp. 321, 323 (D. Kan. 1989), the Court reasoned that Magnus could not show an "occurrence" because PDP intentionally manufactured the adapters out of 2011 grade aluminum.  See Memorandum And Order (Doc. #24) at 6-7.  In other words, the Court found that Magnus's damages were caused by intentional conduct of PDP, i.e. not by accident.

On November 20, 2013, the Tenth Circuit reversed this summary judgment ruling.  See Order And Judgment (Doc. #31) filed November 25, 2013.  The Tenth Circuit found that under Kansas law, an insured's acts are accidental − and therefore an "occurrence" under the policy − if an intentional act results in unintended injury.  Id. at 6.  The Tenth Circuit found that under Kansas law prior to 2008, no "occurrence" happened if the injuries to Magnus were the natural

9

and probable consequence of intentional acts by PDP.  See id. (citing Park Univ. Enters. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1245 (10th Cir. 2006)).  The Tenth Circuit found that in 2008, the Kansas Supreme Court adopted the substantial certainty test.  Id. (citing Thomas v. Benchmark Ins. Co., 285 Kan. 918, 922-32, 179 P.3d 421, 425-31 (2008)).  Under that test, there was no "occurrence" if PDP intended the act and (1) intended to cause some kind of injury or damage or (2) injury or damage was substantially certain to result from the act.  The Tenth Circuit remanded for this Court to evaluate whether intentional acts by PDP led to intended or unintended injuries under either test.  Id. at 7.  In a footnote, the Tenth Circuit stated that Diamond could make a serious argument that Magnus could not prevail because it did not seek to recover property damages in the state court lawsuit.  Specifically, the Tenth Circuit stated as follows:

> Although we do not consider the issue in this appeal because the parties do not present it, a serious argument could be made that Diamond State had no duty to defend [PDP] because the CGL policy does not cover any of the damages claimed by Magnus in the Kansas state lawsuit.  Property damage is defined in the policy to mean "physical injury to tangible property, including all resulting loss of use of that property" (emphasis added).  Although Magnus asserts the adaptors caused property damage because they impaired the functionality of customers' arrows, it did not seek to recover such damages in the Kansas lawsuit.  Instead, Magnus only sought to recover damages arising from "loss of business reputation and loss of business," which are damages to intangible property.  See Hamilton Die Cast, Inc., v. U.S. Fid. & Guar. Co., 508 F.2d 417, 419 (7th Cir. 1975) (concluding a CGL policy insuring against property damage caused by an occurrence did not cover damages to business reputation because those are "damages for injury to intangible property").

Id. at 7-8  n.3.

Following remand, the parties completed discovery and filed supplemental briefs with regard to Diamond's original motion for summary judgment on the issue of coverage.  See Defendant's Supplemental Brief In Support Of Summary Judgment ("Diamond Supplemental Brief") (Doc. #50) filed October 2, 2014 and Plaintiff's Response To Defendant's Supplemental

Brief In Support Of Summary Judgment ("Magnus Supplemental Response") (Doc. #53) filed October 16, 2014.  In addition, Magnus filed a motion for partial summary judgment on the issue of coverage.  See Magnus Motion For Partial Summary Judgment") (Doc. #51).  Neither party seeks summary judgment on the issue whether Diamond breached its duty to defend PDP in the state court proceedings, or whether Diamond is liable for fees and expenses in this action.

## Analysis

As noted, Magnus claims that Diamond breached its agreement to insure and defend PDP, and that Diamond unjustifiably refused to pay the insurance claim.[13]  See Pretrial Order (Doc. #49) at 13-14, ¶¶ (1), (4).  Diamond seeks summary judgment on the coverage claim.  Specifically, it asserts that Magnus cannot recover under the CGL policy because its claims (1) do not result from an "occurrence," (2) fall under the "your product" and "your work" exclusions and (3) fall under the exclusion  for "recall of products, work, or impaired property."  In addition, in a supplemental brief filed after the Tenth Circuit remand, Diamond asserts that as a matter of law, Magnus cannot recover intangible property damages, i.e. loss of business and loss of business reputation, as opposed to damages to tangible property.  See Diamond Supplemental Brief (Doc. #50) at 4-5.  Magnus seeks partial summary judgment, asserting that as a matter of law (1) its lost profits arose because of "property damage" within the meaning of the policy; (2) no exclusions apply; and (3) Diamond cannot prevail on certain defenses which it asserts in the pretrial order.

The parties agree that the CGL policy and Kansas law govern all issues.  Under Kansas

---

[13]     Magnus asserts that it is entitled to recover either as judgment creditor under the state court judgment or under assignment from PDP.  See Pretrial Order (Doc. #49) at 13-14, ¶¶ (2), (3).  The parties do not seek summary judgment on these issues.  Also, as noted, neither party seeks summary judgment on the duty to defend or unjustified denial claims.

law, the construction and interpretation of an insurance policy is a question of law for the Court to decide.  See First Fin. Ins. Co. v. Bugg, 265 Kan. 690, 694, 962 P.2d 515, 519 (1998).  If the relevant facts are undisputed, the Court may determine whether they fall within terms of the policy.  Id.  The Court must construe an insurance contract in a way that gives effect to the parties' intent.  Brumley v. Lee, 265 Kan. 810, 812-13, 963 P.2d 1224, 1226 (1998).  If the policy language is unambiguous, the Court cannot remake the contract and must enforce it as made.  Id.  The Court must take unambiguous language "in its plain, ordinary, and popular sense."  Bugg, 265 Kan. at 694, 962 P.2d at 519.  If language in the policy is ambiguous, the Court construes terms in favor of the insured.  Brumley, 265 Kan. at 812-13, 963 P.2d at 1226.

An insured bears the burden of proving that its claims fall within coverage provisions of the policy.  Id. at 816, 963 P.2d at 1228.  If the insured satisfies this burden, the insurer has the burden of proving that an exclusionary clause precludes coverage.  See Marquis v. State Farm Fire & Cas. Co., 265 Kan. 317, 327, 961 P.2d 1213, 1220–21 (1998).  Policy exclusions generally require a "narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms."  Id. at 327, 961 P.2d at 1220 (citing Catholic Diocese of Dodge City v. Raymer, 251 Kan. 689, 695, 840 P.2d 456, 460 (1992)).  When an insurer intends to restrict coverage, it must use clear and unambiguous language; otherwise the Court will construe the policy in favor of the insured.  Id. (citing Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 248 Kan. 657, 659, 810 P.2d 283, 286 (1991)).

## I.     Whether Magnus's Claims Result From An "Occurrence"

Diamond asserts that as a matter of law, Magnus cannot recover because its claims do not result from an "occurrence."  As noted, the insurance policy applies only to "bodily injury" or

"property damage" which are caused by an "occurrence." <u>See</u> CGL Policy § I, ¶ 1(b).  The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." <u>Id.</u> § V, ¶ 12.

The Tenth Circuit found that under Kansas law, damages are accidental − and therefore an "occurrence" under the policy − if an intentional act results in unintended injury.  <u>See</u> <u>Order And Judgment</u> (Doc. #31) at 6 (citing <u>Park Univ.</u>, 442 F.3d at 1245 and <u>Thomas</u>, 285 Kan. at 922-32, 179 P.3d at 425).   Under the "natural and probable consequences" test that Kansas applied before 2008, the Court may infer intent to cause injury if the injury sustained is the natural and probable consequence of the insured's act.  <u>See</u> <u>Harris v. Richards</u>, 254 Kan. 549, 553, 867 P.2d 325, 327-28 (1994).  As noted, however, in 2008, the Kansas Supreme Court adopted the "substantial certainty" test.   <u>See</u> <u>Order And Judgment</u> (Doc. #31) at 7 (citing <u>Thomas</u>, 285 Kan. at 922-23, 179 P.3d at 425).[14]   Under that test, intentional injury occurs when the insured intends both the act and some kind of injury or damage.  <u>Thomas</u>, 285 Kan. at 922-23, 179 P.3d at 425.  The Court may infer intent to cause injury or damage when the insured's act is "substantially certain" to result in injury or damage.  <u>Id.</u>

Diamond seeks summary judgment because as a matter of law, Magnus cannot show an "occurrence" under the "substantial certainty" test.  <u>See</u> <u>Diamond Supplemental Brief</u> (Doc. #50) at 3-4.  More specifically, it asserts that based on the nature of PDP's conduct, the Court may

---

[14]     <u>Thomas</u> involved an "intentional act" exclusion under a CGL policy.   <u>See</u> <u>Thomas</u>, 285 Kan. at 922, 179 P.3d at 424-25.  The Tenth Circuit found that the same analysis applies when determining whether coverage, <u>i.e.</u> an "occurrence," exists.   <u>See</u> <u>Order And Judgment</u> (Doc. #31) at 7 n.2; <u>see also</u> <u>Mid-Continent Cas.</u>, 754 F.3d at 1182 n.3 (inquiry into whether injury is accidental informs court's determinations as to whether "occurrence" is present and whether "intentional injury" exclusion applies; legal framework for determining whether "occurrence" is present also controls whether "intentional injury" exclusion applies).

infer intent to cause injury or damage which was substantially certain to result from its acts.[15]  Id.

The parties agree that PDP acted intentionally, i.e. that it intentionally manufactured adapters

with 2011 grade aluminum.  The parties also agree that 2011 grade aluminum caused broadheads

to seize on arrows, which caused Magnus to lose business.  Diamond does not assert that PDP

actually intended to cause such injury or damage.  Thus, the issue is whether the Court may infer

such intent because seizing and loss of business were "substantially certain" to result from PDP's

decision to manufacture adapters with 2011 grade aluminum.

As an initial matter, the Court notes that a genuine issue of material fact exists regarding

the terms of the original agreement between Magnus and PDP and − more specifically − whether

it required PDP to use a specific grade of aluminum.  The Tenth Circuit noted the dispute, see

Order And Judgment (Doc. #31) at 2, and the parties' supplemental briefing does not resolve the

issue.  Also, the parties cite no evidence regarding PDP's state of mind, i.e. what it knew or

should have known about the consequences of making adapters with 2011 grade aluminum, at

any relevant time.

Diamond asserts that the Court may infer intent to harm because despite repeated

warnings that adapters were causing serious seizing problems and that Magnus customers were

complaining, PDP continued to provide adapters made with 2011 grade aluminum.  Id.  Diamond

asserts that as a matter of law, PDP's conduct was substantially certain to result in harm to the

---

[15]     Diamond does not address whether the less onerous "natural and probable
consequences" test applies to damages which Magnus sustained before 2008, i.e. before the
Kansas Supreme Court adopted the "substantial certainty" test.  The Court notes that it is easier
to show that injury or damage is the natural and probable consequence of an act than to show that
injury or damage is substantially certain to result from an act.  See Thomas, 285 Kan. at 926,
179 P.3d at 426.  For purposes of ruling on Diamond's motion for summary judgment, the Court
does not address whether the "natural and probable consequences" test applies to some or all of
the Magnus claims.

customers and business of Magnus.  See Diamond Supplemental Brief (Doc. #50) at 4.  This argument has superficial appeal.  Construed in the light most favorable to Magnus, however, the record reveals a genuine issue of material fact on this issue.  As discussed, the record does not establish that the contract required PDP to use a certain grade of aluminum.  In fact, it suggests that PDP never made adapters with anything except 2011 aluminum, and did not make an exception for Magnus.  Moreover, the record contains no evidence regarding whether PDP's use of 2011 aluminum was substantially certain to result in damage to customer arrows or Magnus business.  In light of these disputed and absent facts, the record does not conclusively show that PDP acts were substantially certain to cause injury or damage.

Diamond asserts that on September 30, 2002 − one month after the first PDP invoice − Magnus informed PDP that it was experiencing seizing problems which "could cause us major problems."  See Diamond Supplemental Brief (Doc. #50) at 3-4.  Construed in a light most favorable to Magnus, however, the record supports an inference that the early complaints of seizing were caused by aluminum shavings which PDP corrected.[16]

Diamond asserts that the Court may infer intent to harm because on March 15, 2004, Magnus informed PDP that it was experiencing seizing problems and that under no circumstances should PDP use 2011 grade aluminum, yet PDP continued to sell 2011 grade aluminum adapters until Magnus stopped purchasing them in June of 2005.  See Diamond Supplemental Brief (Doc. #50) at 4 (citing Memorandum from Sohm to Jabben dated March 15, 2004, Defendant's Exhibit V).  Again, construed in the light most favorable to Magnus, the

---

[16]     As noted, in the state court litigation, Sohm stated that in the fall of 2002, Magnus rejected several early shipments because the adapters contained aluminum shavings which caused or contributed to excessive seizing.  See Affidavit Of Mike Sohm ¶ 9, Exhibit P to Diamonds Memorandum (Doc. #18).  Sohm stated that PDP replaced the defective adapters with adapters free of shavings.  Id.

record does not show that as a matter of law, PDP intended to cause injury or damage or that its acts were substantially certain to cause injury or damage to Magnus arrows. As noted, in the underlying lawsuit, PDP denied that it ever agreed to produce adapters out of anything other than 2011 grade aluminum.[17]  At least by March 15, 2004, Magnus knew that PDP was using 2011 grade aluminum. Diamond points to no evidence that PDP somehow represented that it began using higher grade aluminum, yet Magnus continued to purchase the defective adapters through June of 2005. PDP may have intentionally breached the parties' agreement − that issue is subject to rigorous dispute, but it is not dispositive. The record does not establish that as a matter of law, PDP acted with intent to cause harm to arrows of Magnus customers or to its business.[18] Accordingly, Diamond is not entitled to summary judgment on this ground.

## II.    Whether Magnus Seeks Damages Because Of "Property Damage"

Both parties seek summary judgment on the issue whether the damages which Magnus seeks represent "property damage'" under CGL Policy § I, ¶ 1(a). As noted, on appeal, the Tenth Circuit stated that Diamond could make a serious argument that the CGL policy provides no coverage because in the Kansas lawsuit, Magnus sought to recover only lost profits, i.e. damages to intangible property. See Order And Judgment (Doc. #31) at 7-8 n.3 (citing one case, Hamilton Die Cast, Inc. v. U.S. Fid. & Guar. Co., 508 F.3d 417, 419 (7th Cir. 1975)). The parties did not raise the issue on appeal, however, and the Tenth Circuit did not consider or

---

[17]     The parties do not address what effect, if any, the underlying consent judgment should have on the Court's interpretation of the facts. As discussed supra, Magnus contends that the state court judgment precludes Diamond from asserting a comparative fault defense − and any other defense − based on claims that PDP did not effectively defend the state court action. See Magnus Memorandum (Doc. #52) at 32-37.

[18]     Moreover, even if the March 15, 2004 notice provided a basis on which the Court could infer intent to harm, it would not address damages caused by PDP conduct before then.

decide it.  See id.[19]

As noted, Magnus claims that it sustained economic loss as a result of physical damage to tangible property, i.e. arrows.  More specifically, Magnus claims that it lost business because removable broadheads became permanently affixed to arrows, thereby reducing their function, safety and value to customers.  Under the CGL policy, Diamond agreed to pay those sums which PDP became "legally obligated to pay as damages because of … 'property damage' to which this insurance applies."  CGL Policy § I, ¶ 1(a).  "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  Id. § V, ¶ 15.

Diamond asserts that as a matter of law, Magnus cannot recover because it seeks intangible damages − loss of business and loss of business reputation − which do not constitute "property damage" under the policy.[20]  See Diamond Supplemental Brief (Doc. #50) at 5.  In support of its argument, Diamond cites Seventh Circuit law construing state law of Ohio and Illinois: Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co., 508 F.2d 417 (7th Cir. 1975) (Ohio law) and Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co., 548 F.2d 681 (7th Cir. 1977) (Illinois law).  See Diamond Supplemental Brief (Doc. #50) at 5; see also Diamond Opposition (Doc. #54) at 7.  Those cases are not controlling or even directly on point,[21]

---

[19]   Diamond did not explicitly cite this theory as a basis for declining coverage in its declination letter of August 13, 2009.  Also, Diamond did not seek summary judgment on this issue in its original motion for summary judgment.

[20]   As noted, the undisputed facts establish that the consent judgment represents damages for past and future lost earnings suffered by Magnus.  See Journal Entry of Judgment ¶ 2, Exhibit F to Diamond Memorandum (Doc. #18) (citing Regier Report regarding amount of damages Magnus suffered).

[21]   In Hamilton Die, plaintiff sought CGL coverage for damages which it incurred as a result of selling defective tennis racket frames.  The Seventh Circuit found that where no physical harm resulted to other parts of the tennis racket, the mere inclusion of a defective part, i.e. a defective tennis racket frame, did not constitute "property damage" to the finished product.
(continued…)

17

and they do not establish that Diamond is entitled to judgment as a matter of law.[22]

Magnus asserts that as a matter of law, lost profits which it incurred as a result of damage to customer arrows constitute damages because of "property damage" within the meaning of the policy.  See Plaintiff's Memorandum In Support Of Partial Summary Judgment ("Magnus Memorandum") (Doc. #52) at 8-9.  In support of its assertion, plaintiff cites only a law review article published in 1984.  See id. (citing Laurie Vasichek, Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy, 68 Minn. L. Rev. 795 (1984)).

The Court's independent research reveals significant case law which supports the argument that Magnus claims for lost business constitute "damages because of . . . 'property damage'" under the policy.  See, e.g., Mid-Continent Cas. Co. v. Circle S Feed Store, LLC, 754 F.3d 1175, 1187-85 (10th Cir. 2014) (New Mexico law) (same CGL language covers economic loss which is attributable to or caused by physical injury to tangible property); Nat'l Union Fire Ins. of Pittsburgh, Pa. v. Puget Plastics Corp., 532 F.3d 398, 403  (5th Cir. 2008) (Texas law) (same CGL language covers consequential damages, i.e. lost profits and diminution in value);

---

See id., 508 F.2d at 419-20.  As noted, here, Magnus claims that defective adapters caused physical injury to customer arrows.  Moreover, it appears that the policy language in Hamilton Die was different than that involved in this case.  See id. at 419 (policy covered liability for "property damage" which is "caused by an occurrence").

Dreis involved policy language identical to that in this case.  Plaintiff sought coverage for consequential damages incurred as a result of selling a defective press brake.  The Seventh Circuit found that to recover consequential damages, plaintiff must allege some actual injury to "tangible" property.  See Dreis, 548 F.2d at 687.  The Seventh Circuit found that on the facts of that case, the district court did not err in finding no allegation of tangible property damage.  Id. at 688.  Here, by contrast, Magnus alleges injury to "tangible" property, i.e. that removable broadheads became permanently seized on customer arrows.

[22]    As an aside, the Court notes that Diamond's CGL policy does not contain an exclusion for consequential damages, which the damages in issue appear to be.

Wausau Underwriters Ins. Co. v. United Plastics Group, Inc., 512 F.3d 953, 956-58 (7th Cir. 2008) (Illinois law) (same CGL language covers business loss caused by property damage resulting from defective manufacture of water chamber in hot water heater); Ferrell v. West Bend Mut. Ins. Co., 393 F.3d 786, 794 (8th Cir. 2005) (Wisconsin law) (CGL policy covers lost profits caused by property damage); but see Northland Ins. Co. v. Guardsman Prods., Inc., 141 F.3d 612, 617 (6th Cir. 1998) (noting conflict between Michigan and California law: under Michigan law, CGL policy covers consequential loss; under California law, lost profits not covered); see also Jeffrey E. Thomas, New Appleman On Insurance Law § 18.02 (same CGL language covers economic loss which causally follows from direct physical injury to tangible property).  Neither party cites or discusses this authority.  Therefore, although the weight of authority appears to support the position of Magnus, and the Court is inclined to believe that Kansas courts would so find, the Court declines to decide the matter absent further briefing by the parties on the issue − which the parties should include in their trial briefs.

Moreover, even assuming that the policy generally covers intangible damages caused by "property damage," the record does not establish as a matter of undisputed fact that PDP adapters caused damage to arrows which caused Magnus to lose business − which is the sole issue on which Magnus seeks summary judgment.  Magnus urges the Court to determine these facts, but the summary judgment record is not sufficiently developed.  Magnus makes bald factual assertions that PDP-adapter damage to customer arrows resulted in a chain of causation which led to lost profits by Magnus.  See Magnus Memorandum (Doc. #52) at 8.  Indeed, Magnus holds a confessed judgment which renders PDP liable for consequential damages on account of damage to such arrows.  Magnus has not established underlying facts, however, as a matter of

law.[23]   On this record, Magnus has not shown that it is entitled to partial summary judgment on the issue of causation in fact.

### III.   Exclusions

In the pretrial order, Diamond asserts that the following exclusions defeat coverage: (1) "expected or intended injury," (2) "contractual liability," (3) "damage to property," (4) "damage to your product," (5) "damage to your work" and (6) "recall of products, work or impaired property."   See Pretrial Order (Doc. #49) at 14-15; CGL Policy § 2(a), (b), (j)(6), (k), (l) and (n).   Magnus seeks summary judgment on all exclusions.   Diamond seeks summary judgment on the policy exclusions related to "expected or intended injury," "damage to your product" and "recall of products, work or impaired property."

#### A.   Expected Or Intended Injury

Diamond and Magnus each seek summary judgment on whether the "expected or intended injury" exclusion precludes coverage.   See Diamond Memorandum (Doc. #18) at 16-18; Magnus Memorandum (Doc. #52) at 11-20.   That provision excludes coverage for "bodily injury" or "property damage" that is "expected or intended from the standpoint of the insured." CGL Policy, § I, ¶ 2(a).   As discussed, the legal framework for determining the existence of an "occurrence" also controls whether the "intentional injury" exclusion applies.   See Order And Judgment (Doc. #31) at 7 n.2; Mid-Continent Cas., 754 F.3d at 1182 n.3 and 1183.   For reasons stated, the Court finds that Diamond has not shown as a matter of undisputed fact, that PDP

---

[23]   The Court notes that as between Magnus and PDP, the state court judgment appears to establish that PDP adapters caused damage to arrows which caused Magnus to lose business.   Magnus does not seek summary judgment on the issue whether the state court judgment binds Diamond to such factual findings in this case.   Moreover, Magnus does not seek summary judgment on the issue whether PDP became "legally obligated to pay" the consent judgment within the meaning of the policy.

expected or intended to cause physical harm to arrows or lost profits to Magnus.  Conversely, Magnus has not shown that as a matter of undisputed fact, PDP did not intend to cause injury or damage, or that its acts were not substantially certain to result in injury or damage.[24]  Neither party is entitled to summary judgment on this ground.

### B.   Contractual Liability

Magnus asserts that as a matter of law, the "contractual liability" exclusion does not apply.  See Magnus Memorandum (Doc. #52) at 20-21.  That exclusion states that insurance does not apply to "bodily injury" or "property damage" which PDP is obligated to pay "by reason of the assumption of liability in a contract or agreement."  CGL Policy, § I, ¶ 2(b).

Magnus asserts that the "contractual liability" exclusion does not apply because PDP's liability is for breach warranties under the manufacturing contract − not contractual assumption of liability.  See Magnus Memorandum (Doc. #52) at 20-21.  In response, Diamond states as follows:

---

[24]   In its argument, Magnus cites facts and testimony which are not in its statement of facts and which the Court therefore does not consider.  See Magnus Memorandum (Doc. #52) at 11-17.  More specifically, Magnus asserts that Jabben's testimony in the underlying case shows that PDP did not expect or intend to cause broadheads to seize on arrows of Magnus customers. See Magnus Memorandum (Doc. #52) at 11-15.  Magnus asserts that Jabben's "belief in the truth of his own deposition testimony would establish that he did not expect or intend" to harm arrows.  Id. at 12.  Even if the Court considered the additional facts, they would not establish that as a matter of law, PDP did not expect or intend to cause harm.  The record provides no basis on which the Court can make a credibility determination whether Jabben believed the truth of his own deposition testimony.

The remaining arguments and analysis by Magnus are difficult to follow.  See id. at 16-20.  Magnus asserts that Diamond "was not free to take sides against [PDP] on the question of [its] intent to cause harm and/or [its] expectation of harm.  Id. at 16.  This argument seems to go to the duty to defend, not whether the "expected or intended injury exclusion" applies.  Magnus asserts that the underlying claims, i.e. breach of warranty, do not require a showing of knowledge or anticipation of future harm.  See id. at 18-20.  Standing alone, this does not establish that as a matter of law, PDP did not intend to harm or that its acts were not substantially certain to result in damage to arrows and Magnus business.

[Magnus] argues that the Contractual Liability Exclusion does not apply. Diamond agrees since the claims involve neither an "occurrence" nor "property damage" to the arrows. However, in Point II of its brief [Magnus] attempts to argue around the need for actual property damage by claiming that the act of providing the adapters, pursuant to the contract resulted in "property damage" to the arrows. The policy clearly states that Diamond is not responsible for "property damage" for which [PDP] is obligated to pay by reason of the assumption of liability in a contract or agreement. PDP and Magnus entered into a contract for PDP to sell adapters to Magnus. If [Magnus's] claims are taken as true, then the act of providing the adapters, pursuant to the contract, resulted in "property damage" to the arrows. Magnus cannot claim that the claim both originates from property damage and, at the same time, rests only in a breach of warranty. In the event that the Court finds that Magnus' claim originates from property damage, then the contractual liability exclusion applies and Magnus cannot recover from the insurance policy.

Diamond Opposition (Doc. #54) at 10-11.

Diamond's response is difficult to follow. As discussed, Magnus claims that it lost business because removable broadheads became permanently affixed to arrows, thereby reducing their function, safety and value to its customers. The fact that PDP provided the adapters pursuant to a contract does not show that it became obligated to pay "by reason of the assumption of liability in a contract or agreement." On this record, Diamond has not shown a genuine issue whether the "contractual liability" exclusion applies. Magnus is entitled to partial summary judgment on this ground.

## C.    Damage To Property

Magnus asserts that as a matter of law, the "damage to property" exclusion does not apply.[25]  See Magnus Memorandum (Doc. #52) at 20-21. Diamond agrees. See Diamond Opposition (Doc. #52) at 11. Accordingly, Magnus is entitled to partial summary judgment on

---

[25]       In part, the "damage to property" exclusion provides that the insurance does not apply to "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  CGL Policy, § I, ¶ 2(j)(6).

this ground.

>    **D.    Damage To Your Product**

Magnus and Diamond each seek summary judgment on the "damage to your product" exclusion.  See Diamond Memorandum (Doc. #18) at 18-21; Magnus Memorandum (Doc. #52) at 25-26.  That exclusion states that insurance does not apply to "property damage" to "[PDP] product," "arising out of it or any part of it."  CGL Policy, § I, ¶ 2(k).[26]

Diamond asserts that as a matter of law, the exclusion applies because Magnus seeks damages resulting from PDP product, i.e. defective adapters.  See Diamond Memorandum (Doc. #18) at 20-21.  Diamond asserts that such damages "are the very kind of damages" which the "your product" exclusion intends to exclude.  Id. at 21.  Diamond provides no legal authority or analysis to support its assertion.  See id.

Under the plain language of the policy, the "your product" exclusion applies to property damage to the insured's product arising out of the insured's product.  See Potomac Ins. of Ill. v. Huang, No. 00-4013-JPO, 2002 WL 418008, at *14 (D. Kan. March 1, 2002); Hartzell Ind., Inc. v. Fed. Ins. Co., 168 F. Supp.2d 789, 798 (S.D. Ohio 2001).  It does not exclude coverage for property damage to a third party's property arising out of the insured's product.  See Potomac, 2002 WL 418008, at *14; Hartzell, 168 F. Supp.2d at 798.  Here, Magnus does not seek damages for property damage to PDP product.  Rather, Magnus seeks damages resulting from damage to

---

[26]    The policy defines "[y]our product" as follows:

Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
(1)    You;
(2)    Others trading under your name; or
(3)    A person or organization whose business or assets you have acquired[.]
        * * *

Id., § V, ¶ 18.

third parties' property, i.e. arrows of its customers.  Accordingly, the "your product" exclusion

does not apply.  See Potomac, 2002 WL 418008, at *14; Hartzell, 168 F. Supp.2d at 798.

Diamond is not entitled to summary judgment on this ground.

Magnus asserts that as a matter of law, the "damage to your product" exclusion does not

apply.  See Diamond Memorandum (Doc. #18) at 18-21; Magnus Memorandum (Doc. #52) at

25-26.  Based on the above analysis, the Court agrees.  Magnus is entitled to partial summary

judgment on this ground.

> **E.      Damage To Your Work**

Magnus and Diamond each seek summary judgment on the "damage to your work"

exclusion.[27]  See Diamond Memorandum (Doc. #18) at 18-21; Magnus Memorandum (Doc. #52)

at 26-27.  In its reply brief, Diamond admits that under the facts alleged by Magnus, "it was the

product and not the work that was defective."  Defendant's Reply In Support Of Its Motion For

Summary Judgment ("Diamond Reply") (Doc. #22) filed August 26, 2011 at 8.  Diamond states

that the specific exclusion on which it relies is the "your product" exception.[28]  Id.  Based on

these statements, the Court finds that Magnus is entitled to partial summary judgment on this

ground.

---

[27]      The "damage to your work" exclusion provides that the insurance does not apply
to "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the
products-completed operations hazard."   The exclusion does not apply, however, "if the
damaged work or the work out of which the damage arises was performed on your behalf by a
subcontractor." CGL Policy, § I, ¶ 2(l).

[28]      Diamond notes that unlike the "damage to your work" exception, the "damage to
your product" does not exclude products made by subcontractors.  Diamond Reply (Doc. #22) at
8.  The "damage to your work" exception expressly states that it does not apply if the damaged
work was performed on behalf of the insured by a subcontractor.  CGL Policy, § I, ¶ 2(l).  Here,
the undisputed facts establish that PDP subcontracted with ASMS to manufacture the adapters.
Thus, even if the adapters were considered "PDP work" under the policy, the "damage to your
work" exception would not apply because the product was made by a subcontractor.

F.      **Recall Of Products, Work Or Impaired Property**

Magnus and Diamond each seek summary judgment on whether the "recall of products, work or impaired property" exclusion applies.  See <u>Diamond Memorandum</u> (Doc. #18) at 21-23; <u>Magnus Memorandum</u> (Doc. #52) at 22-24.  That exclusion states that insurance does not apply to:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>> (1)     "Your product";
>> (2)     "Your work"; or
>> (3)     "Impaired property";
>
> If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

CGL Policy, § I, ¶ 2(n).[29]

---

> [29]     "Your work" is defined as follows:
>
>> a.      Work or operations performed by you or on your behalf; and
>> b.      Materials, parts or equipment furnished in connection with such work or operations.

<u>Id.</u>, § V, ¶ 18.

"Impaired property" is defined as tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

> a.      It incorporates "your product" or "your work" that is known of or thought to be defective, deficient, inadequate or dangerous; or
> b.      You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> a.      The repair, replacement, adjustment or removal of "your product" or "your work"; or
> b.      Your fulfilling the terms of the contract or agreement.

<u>Id.</u>, § V, ¶ 7.

Diamond asserts that as a matter of law, the "recall of products, work or impaired property" exclusion precludes coverage.  See Diamond Memorandum (Doc. #18) at 21-23. Specifically, it asserts that any damages to Magnus arise out of a recall, i.e. its damages resulted from the cost of replacing what it perceived to be a defective product.  See id. at 22-23.  The Court disagrees.  As noted, Magnus does not seek such damages.  The undisputed facts establish that Magnus seeks to recover the amount of the state court consent judgment, i.e. damages for lost business profits caused by damage to customer arrows.  Accordingly, the "recall of products, work or impaired property" exclusion does not apply.  The Court therefore overrules Diamond's motion and sustains Magnus's motion on this ground.

## IV.    Miscellaneous Arguments By Magnus

Magnus asserts that as a matter of law, Diamond cannot prevail on certain defenses asserted in the pretrial order, i.e. that (1) it had no duty to defend or indemnify PDP because there was no "occurrence" as defined in the policy, Pretrial Order (Doc. #49) ¶ 4(b)(1); (2) any coverage was waived on account of untimely notice by PDP, id. ¶ 4(b)(8); (3) PDP was not in privity of contract with Diamond at the time it consented to judgment in the state court, id. ¶ 4(b)(9); and (4) in the underlying suit, PDP failed to mitigate damages by not attempting to contest damages or compare the fault of Magnus or other potential parties and instead merely agreeing to a consent judgment, id. at 12-13.  See Magnus Memorandum (Doc. #52) at 27-36.

### A.    No "Occurrence"

As a defense in the pretrial order, Diamond asserts that it "did not have a duty to defend or a duty to indemnify PDP in the underlying suit because the underlying claim was not covered under the policies because the action was not an 'occurrence' as defined in the policy."  Pretrial Order (Doc. #49) ¶ 4(b)(1).   Magnus asserts that as a matter of law, Diamond cannot show that

no "occurrence," as defined in the policy, occurred.  See Magnus Memorandum (Doc. #52) at

27-28.  Specifically, Magnus states that based on the Tenth Circuit ruling on appeal, PDP "can

no longer defend based on arguments" that PDP use of a lower grade aluminum was not an

accident.  See id. at 28.  Its reasoning is difficult to follow.  As discussed, whether an

"occurrence" happened depends on whether PDP intended to cause injury or damage or based on

the nature of its conduct, the Court may infer that it did so.  As previously noted, material fact

issues preclude summary judgment on this issue.

**B.      Untimely Notice**

As another defense in the pretrial order, Diamond asserts that "[a]ny coverage that may

have existed was waived as the result of untimely notice by the insured."  Pretrial Order

(Doc. #49) ¶ 4(b)(8).  Magnus seeks summary judgment because as a matter of law, Diamond

incurred no loss as a result of the late notice.  See Magnus Memorandum (Doc. #52) at 28-31.  In

support of its assertion, Magnus relies on facts and testimony which it did not include in its

statement of facts and which the Court therefore does not consider.  See id.  On this record,

Magnus has not shown that it is entitled to partial summary judgment on this ground.

**C.      No Privity Of Contract**

As another "defense" in the pretrial order, Diamond denies that PDP was in privity of

contract with Diamond.  Specifically, Diamond states as follows:

> [Diamond] denies that PDP is in privity of contract with [Diamond] at the time
> the consent judgment was entered into, i.e., although [Diamond] did have an
> insurance contract with PDP, there was no coverage for the claimed losses.

Pretrial Order (Doc. #49) ¶ 4(b)(9).

Magnus urges the Court to reject this defense as a matter of law, but its reasoning and

analysis are difficult to follow.  See Magnus Memorandum (Doc. #52) at 32.  Magnus states that

(1) the warranty breaches occurred during the time when the CGL policies were in effect; (2) Diamond "admits" that the warranty breaches and arrow damage occurred during the policy period;[30] and (3) the policy allowed PDP to submit its claim after expiration of the latest coverage period.  See Magnus Memorandum (Doc. #52) at 31-32.  To support its assertions, plaintiff cites Black's Law Dictionary for the definition of "privity of contract."  Id. at 32.

On this record, Magnus has not shown that it is entitled to summary judgment.  As noted, its logic and arguments are difficult to follow.  Coverage apparently ended on September 21, 2005.  PDP notified Diamond of the underlying lawsuit on August 9, 2009, and requested that it defend and indemnify.  Four days later, Diamond declined.  PDP confessed judgment in the underlying suit on June 22, 2010.  As part of the settlement, PDP assigned its rights under the CGL policies to Magnus.  Beyond those naked facts, the Court has no idea what Diamond's so-called "defense" is all about, or why Magnus would be entitled to summary judgment on it.

Diamond's three-sentence response is equally difficult to follow.  Diamond states that Magnus has not shown that "there was privity between Magnus and PDP so as to give rise to the claim present before the court."  Diamond Response (Doc. #54) at 15.  It is unclear why Diamond responds with statements about privity between Magnus and PDP when the defense stated in the pretrial order alleges lack of privity between Diamond and PDP.

During the telephone status conference, counsel for Diamond stated that the privity defense is "really more of a standing issue and we're saying if there's no privity, then Magnus doesn't have standing to bring the claim."  Counsel stated that it appears that Kansas law would allow PDP to assign its claim to Magnus, however, and conceded that the Court should enter

---

[30]     The record does not establish this "admission" by Diamond or when damage to arrows occurred.

summary judgment for Magnus on the issue.   On this record, however, the Court cannot determine what the defense or issue is.

The Court will not construct arguments for or against the parties, and on this record, Magnus has not shown that it is entitled to partial summary judgment.

###    D.    Improper Defense Of Underlying State Court Action

As a factual contention in the pretrial order, Diamond asserts that PDP failed to mitigate damages "by not making any attempt to meaningfully contest damages alleged by Magnus, not attempting to compare fault of Magnus or any other potential parties and instead merely agreeing to a consent judgment." Pretrial Order (Doc. #49) at 12-13.  Magnus urges the Court to reject Diamond's comparative fault defense as a matter of law.[31]    See Magnus Memorandum (Doc. #52) at 32-35.   Diamond's response is nonresponsive and difficult to follow.[32]    See Diamond Opposition (Doc. #54) at 16.  Ordinarily, under these circumstances the Court would be inclined to sustain plaintiff's motion as uncontested under D. Kan. Rule 7.4.  Before doing so,

---

[31]    Magnus also urges the Court to reject "any and all other defenses founded upon claims that [PDP] failed to effectively defend the State Court action." Magnus Memorandum (Doc. #52) at 35.  Magnus provides no analysis regarding other defenses, and the Court will not construct arguments on its behalf.

[32]    Diamond's response does not even discuss comparative fault.  It asserts that for Magnus to "set forth the elements necessary for summary judgment on the issue of improper defense of underlying action," it must establish that Diamond denied coverage in bad faith and that the consent judgment constitutes a reasonable, good faith settlement.   See Diamond Opposition (Doc. #54) at 16 (citing Assoc. Wholesale Grocers v. Americold Corp., 261 Kan. 806, 934 P.2d 65 (1997)).  The authority which it cites is no more on point than its argument.  In Assoc. Wholesale, the excess insurance carrier had no duty to defend until the primary insurer exhausted its policy limits.  See id., 261 Kan. at 830, 934 P.2d at 81.  When that happened, the insurer offered to defend but the insured declined and agreed to judgments in excess of policy limits without consent of the excess carrier.  See id., 261 Kan. at 831-35, 934 P.2d at 82-84. Here, by contrast, Diamond conducted a three-day investigation and completely refused to defend.

however, the Court must determine whether summary judgment is appropriate under Rule 56, Fed. R. Civ. P.  See Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002).

In support of its motion for partial summary judgment, Magnus attempts to argue the merits of an underlying comparative fault defense.  Specifically, Magnus asserts that in the state court action (1) PDP "likely" could not have defended Magnus's claims based on comparative fault; (2) PDP could not have compared the fault of its subcontractor, ASMS; and (3) Diamond "could have attempted to prosecute a comparative fault defense."  Magnus Memorandum (Doc. #52) at 32-33.  Even if Magnus established these matters as points of undisputed fact − which it has not − it has not shown that as a matter of law they would preclude Diamond from challenging the adequacy of PDP's defense of the underlying claims.

Magnus asserts that under the mutuality rule discussed in Crist v. Hunan Palace, Inc., 277 Kan. 706, 717-18, 89 P.3d 573, 580-81 (2004), the state court judgment binds Diamond and it cannot re-litigate issues such as comparative fault.[33]  See Magnus Memorandum (Doc. #52) at

---

[33]      In Crist, plaintiff suffered injuries when a restaurant delivery driver crossed the centerline and struck plaintiff's vehicle.  In the underlying action, plaintiff sued the driver and restaurant for negligence and negligent training and supervision.  While the underlying case was pending, the restaurant sought coverage under its CGL policy.  The insurer refused to defend or indemnify based on an automobile exclusion.  Thereafter, the insured restaurant stipulated to facts which resolved the underlying proceeding in favor of plaintiff.  Plaintiff initiated garnishment proceedings to collect the underlying judgment from the insurer.  In the garnishment action, the district court entered summary judgment in favor of plaintiff, and the Kansas Court of Appeals affirmed.  The insurer appealed to the Kansas Supreme Court, asserting that the lower court erred in not scrutinizing whether the underlying judgment violated its due process rights.  See Crist, 277 Kan. at 716, 89 P.3d at 580.  The Kansas Supreme Court rejected that argument.  It found that the lower court had correctly found that because the insurer was in privity with its insured and failed to provide a defense, it was bound by the underlying judgment.  See id., 277 Kan. 717-18, 89 P.3d at 580-81.  The Kansas Supreme Court found that a consent judgment has collateral estoppel effect and that only a void judgment is subject to collateral attack.  See id., 277 Kan. at 717-18, 89 P.3d at 581.  Noting that the insurer did not assert that the judgment was void or that it lacked notice or an opportunity to be heard, the Kansas Supreme Court found that the insurer's claims did not implicate due process.  See id., 277 Kan. at 718, 89 P.3d at 581.

33-35.  Magnus offers no factual or legal analysis, however, to support its conclusion.  As noted, Magnus argues that the state court judgment precludes Diamond from asserting that PDP failed to adequately defend the state court action.  See Magnus Memorandum (Doc. #52) at 33-35. While Magnus seeks summary judgment on Diamond's comparative fault assertions, it does not seek summary judgment on whether the state court judgment has other preclusive effect or whether Diamond can prevail on its eleventh "defense" that "res judicata, collateral estoppel, estoppel by judgment, and/or issue preclusion [do not] apply to the facts alleged by Magnus in the underlying cases."  Pretrial Order (Doc. #49) ¶ 4(11).  Although the facts seem to suggest that as insurer and insured, Diamond and PDP are in privity and principles of collateral estoppel could apply, neither party has presented cohesive and persuasive reasons why it should prevail on the comparative fault defense.  On this record, Magnus is not entitled to summary judgment on the issue whether Diamond can assert that PDP failed to mitigate its damages by not asserting a comparative fault defense.

IT IS THEREFORE ORDERED that Defendant's Motion For Summary Judgment (Doc. #17) filed July 11, 2011 be and hereby is OVERRULED.

IT IS FURTHER ORDERED that plaintiff's Motion For Reconsideration Of Denial Of Oral Arguments On Summary Judgment (Doc. #43) filed May 5, 2014 be and hereby is OVERRULED.

IT IS FURTHER ORDERED that the Motion Of Plaintiff, Magnus, Inc., For Partial Summary Judgment On The Question Of Insurance Company Liability For Payment Of The State Court Judgment (Doc. #51) filed October 3, 2014 be and hereby is SUSTAINED in part. The Court finds that as a matter of the law, the following exclusions do not apply: (1) "contractual liability," CGL Policy, § I, ¶ 2(a); (2) "damage to property," CGL Policy,

§ I, ¶ 2(j)(6); (3) "damage to your product," CGL Policy, § I, ¶ 2(k); (4) "damage to your work," CGL Policy, § I, ¶ 2(l); and (5) "recall of products, work or impaired property," CGL Policy, § 1 ¶ 2(n).

**IT IS FURTHER ORDERED** that this case is set for trial on the Court's docket beginning **July 6, 2015, at 9:00 a.m.** in Wichita, Kansas.

**IT IS FURTHER ORDERED** that on **June 9, 2015, at 1:30 p.m.**, the Court will hold a telephone status conference to address issues for trial.  An order setting deadlines for pretrial filings will follow.

Dated this 31st day of March, 2015 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
